UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSE A. VELEZ,                                    :

        Plaintiff,                                :

        vs.                                      :     No. 3:13cv01503 (WIG)

CAROLYN W. COLVIN,                                :
Acting Commissioner of Social
Security Administration,                          :

        Defendant.                                :
-------------------------------------------------------X

RECOMMENDED RULING ON PENDING MOTIONS

     Plaintiff, Jose A. Velez, brings this action under 42 U.S.C. § 405(g),  seeking review of

the final decision of the Social Security Commissioner, denying his application for Social

Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Plaintiff

now moves this Court to reverse the decision of the Commissioner and to remand this action to

the Social Security Administration for a determination of benefits [Doc. # 16].  In response,

Defendant has moved for an order affirming the Commissioner's decision [Doc. # 20].  For the

reasons set forth below, the Court recommends that the Commissioner's decision be reversed and

remanded for further proceedings consistent with this ruling.

Background

     Plaintiff was born in 1973.  His schooling ended after the ninth grade.  He has worked as

a nurseryman and a construction worker.  He last worked on November 3, 2008, his alleged onset

of disability date.  (R. 388, 492).

     On May 25, 2010, Plaintiff filed his application for DIB, alleging an inability to work.

1

(R. 155).  His claims were denied initially and upon reconsideration.  A hearing was then held before Administrative Law Judge ("ALJ") Roy P. Liberman on March 29, 2012, at which Plaintiff, who was represented by counsel, testified.  (R. 45-68).  He was 39 years old at the time. (R. 49).

Plaintiff testified that his disability stems from the last occasion that he worked, at Young's Nursery in Wilton, Connecticut.  (R. 54).  The injury occurred while Plaintiff was attempting to move a tree with the help of three other men.  (R. 50-1).  During their attempt to move the tree, Plaintiff heard something pop, which he later learned was his left testicle.  (R. 51). Plaintiff reported that he needed to have two surgeries to repair the damage to his testicle, because the first surgery left scar tissue that caused him pain.  (R. 57).  Plaintiff also testified that he has issues with ulcers, herniated discs, and arthritis in his spine.  (R. 58).  He also noted a surgery on his right leg six years prior, stemming from a construction accident.  (R. 61-2).

Plaintiff added that he suffers from depression and that he had attempted to kill himself two months prior.  (R. 60).  He indicated that medicine helped with the depression, but that his inability to work caused the depression to return.  (R. 61).  When he was suffering from depression he would stay in his room all day, and sometimes for three days at a time.  (R. 66). Plaintiff testified that he took Percocet for a time, but it added to his depression, so at the time of the hearing he was only taking Tylenol.  (62-3).

As to his daily activities, Plaintiff testified that he goes to church almost every day, sometimes for as long as four and a half hours.  (R. 63-4).  While at church he would need to keep changing positions to relieve his pain.  (R. 64).  He would also spend time reading at home. (R. 64).  Plaintiff would visit with his mother, who he indicated would help him bend to use the

toilet and do other activities that involved using his right side.  (R. 65).  She would also help to

clean his apartment.  *Id.*  His girlfriend would go food shopping for him and occasionally fix him

meals.  (R. 66).

On April 17, 2012, ALJ Liberman issued his decision finding that Plaintiff had not been

under a disability from November 3, 2008, through March 31, 2010, his date last insured.  (R.

38).  The Appeals Council affirmed the ALJ's decision, thus rendering his decision the final

decision of the Commissioner for appeal purposes.  This appeal ensued.

<u>The ALJ's Decision</u>

In reaching his decision, the ALJ followed the prescribed five-step sequential evaluation

process.[1]  20 C.F.R. §§ 404.1520.  At step one, he determined that Plaintiff had not engaged in

substantial gainful activity during the period of time from Plaintiff's alleged onset date,

November 3, 2008, through Plaintiff's date last insured.  At step two, he found that Plaintiff had

the following severe impairments: pain in left testicle, status post surgery, degenerative changes

with herniated discs in the lumbar spine and lumbar radiculitis, obesity, hiatal hernia, and bipolar

disorder.  At step three, the ALJ held that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments, 20

C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  The ALJ then assessed Plainitff's

residual functional capacity ("RFC"), finding that Plaintiff retained the RFC to perform the full

range of sedentary work with a non-exertional limitation of performing simple one- to three-step

entry-level work tasks.  At step four, the ALJ determined that Plaintiff was unable to perform any

---

[1]  The ALJ found that Plaintiff met the insured status requirements for DIB through
March 31, 2010.

3

of his past relevant work.  At step five, he determined that there were jobs that existed in

significant numbers in the national economy that Plaintiff could perform, including surveillance

systems monitor and table worker.  Based on these findings, the ALJ held that Plaintiff was not

disabled.

Agency Documents

The initial Disability Report, dated May 27, 2010, indicates that Plaintiff's medical issues

were herniated discs, arthritis of the spine, serious pain in left testicle, and surgery on both of his

legs. (R. 197).  Plaintiff reported that these conditions caused him to stop working.  *Id.*  In

subsequent Disability Reports, Plaintiff indicated that his conditions were getting worse.  (R.

210, 221).

Plaintiff completed an Activities of Daily Living ("ADL") Report on August 1, 2010, in

which he described his daily activities as "Wake up; take a shower & brush my teeth; pray, read

the Bible, watch TV, take my meds, eat - go to program, eat & go to sleep." (R. 229).  Plaintiff

reported that he cooks for himself and was able to go shopping for food once a month for an hour

at a time and for clothes once every two or three months again for an hour at a time.  (R. 231,

233).  Plaintiff noted difficulties with managing his money.  (R. 233).  He stated that since his

conditions developed he experienced difficulties with working, bending, carrying items, pushing,

lifting, and concentrating.  (R. 230).  His sleep was also affected by his pain.  *Id.*  He reported

needing reminders to take his medications, and that he was taking Abilify, Divalproex, Cymbalta,

and Tylenol.  (R. 230-31).  Plaintiff could do light cleaning and laundry, but was limited by his

pain.  (R. 232).  Plaintiff indicated that he could go out alone, and that he would take public

transportation because he did not drive.  *Id.*  Plaintiff reported watching television and reading

4

every day, and going to church two to three times a week.  (R. 233).  He stated that the following

were affected by his conditions: lifting, squatting, bending, standing, walking, sitting, kneeling,

stair climbing, completing tasks, concentrating, and memory.  (R. 234).  He specifically noted

that he "can't remember stuff," that he can't complete tasks, and as to concentration he stated that

it was "very hard for [him], [he] get[s] easily distracted."  *Id*.  Plaintiff disclosed that he can only

pay attention for fifteen to thirty minutes and that he doesn't handle stress well.  (R. 235).

<u>Plaintiff's Medical Records</u>

Plaintiff's medical records date back to August 2, 2008, when his girlfriend transported

him to Bridgeport Hospital due to an intentional overdose.  (R. 389-98).  Plaintiff admitted to

taking fifteen Percocet and seven Naprosyn.  (R. 390).  Treatment notes indicate that Plaintiff

"admitted being separated from wife and two children past 8 mos [sic] has been difficult.

Reported that he was drinking and impulsively took pills not wanting to harm self."  (R. 394).

Plaintiff returned to Bridgeport Hospital on November 4, 2008, complaining of "[lower

left quadrant abdominal] 'pulling' pain with 'a ball there' after lifting a heavy object yesterday, no

relief with aleve."  (R. 388).  He was noted as having a pain level of eight out of ten, and was

diagnosed with a hernia and abdominal pain.  (R. 387-88).  Plaintiff was treated by Dr. Richard

Garvey the next day, who recommended bed rest for two weeks and ordered a CT Scan.  (R. 497,

500-02).  The CT scan revealed mild distal descending colon diverticulosis without diverticulitis,

mild sigmoid colon diverticulosis with mild diverticulitis, but without intraperitoneal free air or

abscess, probable fatty liver, small hiatal hernia, and small fat-containing right inguinal hernia.

(R. 508-09).  Plaintiff was treated by Dr. Robert Weinstein, of Urological Associates of

Bridgeport, again complaining of pain in his left groin and testicle stemming from the tree

5

moving incident. (R. 445-50). Dr. Weinstin indicated that Plaintiff's "pain however does not seem to be testicle but seems to be associated with movement and likely muscle spasms." (R. 449). Dr. Weinstein recommended an orthopaedic consultation, and noted that the condition is a "work related type injury, which is likely a muscle strain . . . I explained that the testicle itself and the surrounding structures appear unremarkable but the associated cremasteric fibers are obviously very sensitive and reflexic." *Id.*

Plaintiff was treated by Dr. Eric Katz on December 9, 2008, who noted that Plaintiff had some tenderness of the spine and tenderness in the inguinal area. (R. 506). Plaintiff was sent for a second opinion with Dr. Mpuku, "who did not feel there was a hernia."[2] *Id.* On December 18, 2010, Dr. Katz noted that the "[l]umbrosacral spine reveals muscle spasm and tenderness in the lower lumbosacral region from L4 to S1 on the left. Forward flexion to extension is 60 to 20° with discomfort beyond." *Id.* Dr. Katz recommended an MRI and physical therapy. The MRI was performed on January 13, 2009, and revealed multilevel degenerative changes which were most severe at the L4-5 level. (R. 503, 505). At the L4-5 level Dr. Michael Meszaros found "disc dessication and loss of intervertebral disc space height at this level. There is mild facet arthropathy. There is diffuse disc bulging. The spinal canal is patent. The neural foramina are mildly narrowed." (R. 503). On January 22, 2009, Dr. Katz noted that Plaintiff had "[persistent pain in the left groin radiating into the left testicle,"and added that the "recent MRI evaluation of the lumbar spine reveals generalized, multilevel degenerative disease." (R. 507). A physical examination revealed "tenderness over the left inguinal area. There is no tenderness or muscle

---

[2] Dr. Mpuku also ordered a pelvic CT scan, which revealed diverticulosis and a "small right inguinal hernia containing fat." (R. 504).

spasm in the low back region.  The range of motion is functional with discomfort on maximum flexion."  *Id.*

On April 23, 2009, Plaintiff went to Bridgeport Community Health Center complaining of severe pain in his left lower quadrant and left testicular pain.  (R. 429).  Plaintiff was examined by urologist Dr. Jeffrey Small on June 1, 2009.  (R. 373).  Dr. Small noted that Plaintiff's "left epididymis is exquisitely tender and upon palpation he duplicates his pain radiating to the groin."  *Id.*  He diagnosed Plaintiff with chronic left epididymitis and prescribed Cipro and an anti-inflammatory. (R. 374).  Plaintiff was seen at Bridgeport Community Health Center on July 2, 2009, complaining of pain stemming from the tree moving incident.  (R. 320).  Plaintiff followed up with Dr. Small on July 9.  (R. 370).  Dr. Small noted that Plaintiff had no relief from the Cipro and the anti-inflammatory.  He further diagnosed Plaintiff with chronic prostatitis and stated "he is incapacitated by the pain, has painful ejaculation, pain in the left groin, left testicle and left back area."  *Id.*

Plaintiff was treated by Dr. Rahul Anand of Connecticut Pain & Wellness Center, LLC, on July 20, 2009.  Dr. Anand diagnosed Plaintiff with neuropathy, lumbar radiculitis, unspecified, and intervertebral disc and low back syndrome.  (R. 528).  Dr. Anand noted in the treatment records that Plaintiff is a "36 year old male with chronic Lumbar [herniated nucleus pulposus], Lumbar Radiculitis, Lumbar Facet Syndrome, Pelvic pain - [not otherwise specified], and Myofascial Syndrome (MFS).  MRI Lumbar 1/09: L3-4 diffuse disc bulge, L45 [degenerative disc disease], loss disc height diffuse disc bulge, [facet arthropathy], L5-S1 transitional vertebrae."  (R. 529).  Dr. Anand recommended pain medication, and discussed "ilioinguinal/hypogastric nerve blocks if persistent pain."  *Id.*

An endoscopy performed on July 30, 2009, revealed a hiatal hernia, gastric and duodenal ulcers, erosive gastritis, and short segment Barrett's esophagus." (R. 335). A follow-up endoscopy performed on August 27, 2009, once again revealed a hiatal hernia and erosive gastritis. (R. 332-33). Plaintiff also had a colonoscopy on August 6, 2009, which revealed diverticulosis coli. (R. 337). On August 16, 2009, Plaintiff was brought to the Bridgeport Hospital emergency room by police. (R. 365). He was noted as being "combative and incoherent," and his mental state was described as "agitated [and], uncooperative." *Id.* The only diagnosis was "AMS" or altered mental state. (R. 364).

Plaintiff was seen by Dr. Anand on October 20, 2009, who noted that Plaintiff stated "his left groin and back pain remains unchanged for one year." (R. 524). Plaintiff's gait was reported as normal and his motor function was "5/5 throughout, symmetric." (R. 525). Dr. Anand opined that Plaintiff "is capable of performing routine ADL's with moderate difficulty." (R. 524). On examination of Plaintiff's spine, his lumbar/cervical extension was 10˚, flexion was 40˚, and rotation/lateral bend was 10˚. (R. 525).

Plaintiff had three sets of transforaminal epidural steroid injections, one on October 28, 2009, one on November 12, 2009, and one on December 3, 2009. (R. 522-23, 518-21, 513-14). At the second procedure it was noted that Plaintiff stated that "his leg, foot and groin pain is improved with an initial procedure. He states that his knee pain is better as well." (R. 518). In regards to Plaintiff's mental status, Dr. Anand noted that Plaintiff "and his wife report depression due to his chronic pain, and numerous doctor visits over the year. I have initiated cymbalta and referred him for [cognitive behavioral therapy], coping skills, and psychological therapy." *Id.* At the third session, Plaintiff's pain was noted as being "much improved." (R. 513). Dr. Anand

added that Plaintiff "has pain with lifting and lateral bending [consistent with] facetogenic pain . . . . I have suggested that the patient pursue a spermatic cord diagnostic block with this urologist to evaluate testicular and spermatic cord pain which the patient describes as his 'meat pain' when pressure is applied to area." *Id.*

On December 8, 2009, Plaintiff was at Bridgeport Community Health Center complaining of posterior testicular pain which radiated to his lower left quadrant. (R. 427). Plaintiff was referred to another urologist for a second opinion. Plaintiff was treated by Dr. Anand on December 22, 2009, after reporting "ongoing lower back and left groin pain that is unchanged from his last office visit." (R. 510). Plaintiff also reported having neck pain.

The next day Plaintiff was treated by Dr. Milton Armm, a urologist, who noted that "[i]f retractile testicle is clinically documented, would need to consider left orchidopexy in near future." (R. 400, 402). Dr. Armm performed the orchidopexy on January 29, 2010.[3] (R. 401). On February 15, 2010, Dr. Armm noted that Plaintiff's pain was sharply reduced since the surgery. (R. 402).

Plaintiff was then seen at St. Vincent's Hospital in Bridgeport for an ultrasound, which revealed normal testicles and a small hiatal hernia. (R. 413). Plaintiff went to the Yale-New Haven Hospital emergency room on February 25, 2010, for a second opinion. (R. 285-303). Plaintiff was diagnosed with Richter's Hernia and referred to a surgeon. (R. 287).

On March 1, 2010, Plaintiff had a psychiatric evaluation at Bridgeport Community Health

---

[3] The procedure is also referred to as an "orchiopexy" in the record. (R. 361-62).

Center, stemming from his depression.  (R. 311-12).  Plaintiff stated that he smoked marijuana,[4]

got angry easily, and when he got angry "he just [felt] like punching walls.  Has history of

persecutory paranoid dreams.  Sometimes he [felt like he has been] persecuted."  (R. 312).

Plaintiff indicated that he was not suicidal, but did state that he had instances of past suicidal

behavior.  He indicated that he had mood swings and poor sleep.  In regards to his intelligence,

Plaintiff remarked that "I always had F's," in school.  (R. 312).  Plaintiff also reported that he had

mental retardation, and it was noted that his "judgment, insight and abstract thinking were poor."

(R. 311).  The treatment notes indicate that Plaintiff had "[l]ow credibility. Concealing

information.  Intellect was dull, not psychotic, not suicidal." (R. 311-12).  The medical

provider's impression was bipolar illness, DSM code 296.80, and "intellectual insufficiency,"

DSM code 319.[5]  (R. 311).

     Dr. Armm met with Plaintiff on March 17, 2010, and noted him as being asymptomatic

and recommended that Plaintiff return to work on March 22, 2010.  (R. 402).  Dr. Katz filled out

a physician's permanent impairment evaluation on March 29, 2010, in which he opined that

Plaintiff's lumbosacral spine had a permanent loss of 8%.  (R. 583).[6]

     On April 15, 2010, Plaintiff was treated at Bridgeport Community Health Center.  He

indicated that "he had surgery on left testicle and went back to work.  Patient state[d] he [was]

---

    [4]  Although Plaintiff indicated that he smoked marijuana, a drug screen performed on this occasion was negative.  (R. 311).

    [5]  DSM code 319 is mental retardation severity unspecified.  *DSM-IV-TR: numerical listing of codes and diagnoses*, BEHAVENET (Oct. 2, 2014), http://behavenet.com/dsm-iv-tr-numerical-listing-codes-and-diagnoses.

    [6]  The subsequent medical records all occur after Plaintiff's date last insured of March 31, 2010.

feeling pain again in left testicle and it [was] very difficult to walk with pain." (R. 317). Plaintiff stated that, although the surgery initially relieved his symptoms, his pain returned when he started working again. He indicated that his back pain was "5/10, but when bending waist [up to] 8/10. Can't sleep at night." *Id.* The next day Plaintiff returned to the Center for mental health treatment. He stated "I feel calm," and denied any anger. (R. 314). Plaintiff indicated that he was sleeping well, was not depressed, psychotic, or suicidal. *Id.*

Dr. Weinstein treated Plaintiff on May 4, 2010, for Plaintiff's complaints of pain in his testicle. Dr. Weinstein noted that "the left testicle is high in the scrotum and tender on palpation. There were no obvious inguinal hernias." (R. 452). Plaintiff, complaining of testicular retraction when ejaculating, lifting, and shoveling at work, was treated by Dr. Armm on May 19. (R. 404).

Plaintiff underwent an intake evaluation at FSW Behavioral Health Department on August 5, 2010. (R. 474-81). He was noted as having stopped taking Cymbalta, Abilify, and Divalproex in July 2010. (R. 476). Plaintiff was diagnosed with "major depressive disorder recurrent [with] psychotic features, [rule out] post traumatic stress disorder," on Axis I.[7] On Axis III Plaintiff's testicle and back problems were noted. Plaintiff's global assessment of functioning ("GAF") was noted as being 45, which indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."[8] (R. 479). On August 12, Plaintiff was at Bridgeport Community Health Center, reporting that he felt well, felt

---

[7] Axis I is a classification used with the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). It covers various mental and learning disorders.

[8] Gaf Score (Global Assessment of Functioning), Gaf Score (Sept. 18, 2014), http://www.gafscore.com/ .

more calm, denied suicidal ideations, and said he was tolerating the medications well.  (R. 314).

On August 24, 2010, a master treatment plan from FSW indicates that Plaintiff's GAF score,

while still in the serious range, had increased to 50.  (R. 482).

On August 26, 2010, Plaintiff was at Bridgeport Hospital's emergency department,

complaining of testicle pain that had worsened over the last three days.  (R. 349).  An ultrasound

showed no changes from previous tests.  (R. 352).  After being given pain medication, Plaintiff

reported having no pain or discomfort, and was noted as having "ambulated to [emergency

department] lobby with steady gait, [no active disease]."  *Id.*  On September 17, 2010, Dr. Armm

opined that another orchidopexy might be needed if Plaintiff's pain persisted.  (R. 404).

Dr. Weinstein's examination of Plaintiff on September 29, 2010, revealed that "[t]he left

testicle upon initial inspection was in the upper aspect of the scrotum, almost in the inguinal

region.  I was able to relax Jose and the testicle did drop down into the scrotum but upon

palpation, it rapidly migrated back up into the groin."  (R. 452).  Dr. Weinstein opined that

Plaintiff's "options include no intervention versus some sort of muscle relaxant versus a formal

orchidopexy where the cremasteric fibers are released."  *Id.*  Plaintiff chose to undergo the

procedure, and on November 1, 2010, Dr. Weinstein performed a "left inguinal approach

orchidopexy with testicular fixation."  (R. 417-18).

On November 9, 2010, Plaintiff had a psychiatric evaluation with Dr. Lee Combrinck-

Graham.  (R. 492-495).  Dr. Combrinck-Graham's assessment was as follows:

> His flow of ideas was somewhat confusing, as he seemed to be trying to present himself
> in several different ways, as a healthy person just injured, as a chronically disabled person
> from his right leg and now arthritis of the back, as a convert who is now in love with a
> good woman who loves God, whom he has never met, and as a roistering drug and
> alcohol abuser with lots of anger.  He reports hallucinations that are mostly mood

12

> congruent.   He seems to have some cognitive slippage.   He has poor insight and
> judgment.

(R. 494).  Dr. Combrinck-Graham also noted that "[t]his instability of thoughts and goals is

significant in that he appears to have a major thought disorder along with mood instability . . .

Undoubtedly his mood instability has been exacerbated by drug use." (R. 494).  Plaintiff's mental

diagnoses were mood disorder, rule out schizoaffective disorder, polysubstance dependence in

recovery, rule out personality disorder not otherwise specified, and a GAF score of 48.  *Id.*

Plaintiff next met with Dr. Weinstein on November 17, 2010, as a follow-up to the

second orchidopexy.  (R. 453).  Dr. Weinstein noted that Plaintiff "has done well since the

procedure.  His pain and swelling have decreased in intensity. . . on examination the inguinal

incision is healing wonderfully and the testicle is in its normal position, well within the left

hemiscrotum." *Id.*  Plaintiff also complained of an issue with his frenulum being tight, for which

a frenuloplasty procedure was discussed.  *Id.*  A November 30th note from FSW indicates that

Plaintiff had a GAF score of 50.  (R. 490).

On December 1, 2010, Plaintiff was seen at Bridgeport Community Health Center for

complaints of knee pain, low back pain, lower left quadrant pain, and diarrhea.  (R. 664).  The

next day, at FSW, Plaintiff was prescribed Vistaril.  (R. 496).  Dr. Weinstein noted on December

15 that Plaintiff's "left testicle is still mildly tender but improving and he does not have any

issues with migration up into his groin." (R. 453).  Plaintiff again discussed with Dr. Weinstein

the issue with his frenulum, and on December 29, 2010, Dr. Weinstein performed a

frenuloplasty.  (R. 453).  An x-ray of Plaintiff's right knee was performed on December 16, and

revealed nothing abnormal.  (R. 626).

On December 22, 2010, Plaintiff sought treatment at Bridgeport Hospital complaining of abdominal pain, for which an endoscopy was prescribed.  (R. 466-73).  Plaintiff was noted as being obese, with a height of 70 inches and a weight of 251 pounds.  On January 10, 2011, a CT scan revealed "[m]ild descending and sigmoid diverticulosis without diverticulitis."  (R. 642-43). In a treatment note from February 16, 2011, Dr. Weinstein noted that "[o]n examination, his testicles are slightly tender on palpation but well within the left hemiscrotum.  There is no evidence of retractile testes and of course, he is delighted with such."  (R. 454).  Dr. Weinstein also opined that Plaintiff had a 15% permanent disability of his left testicle.  (R. 581).  Plaintiff also indicated that he was interested in having a circumcision, which was performed on March 14, 2011.  (R. 454, 462).

On February 23, 2011, Plaintiff's GAF score was noted as 50, and it was opined that Plaintiff was "still presenting depressive symptoms due to physical disability."  (R. 488). Additionally, on the 23rd, treatment records from FSW indicate that Plaintiff was experiencing auditory hallucinations and "cognitive slippage."  (R. 433).  Despite this, the only problems noted were slight, in the areas of handling frustration appropriately, asking questions or requesting assistance, and carrying out multi-step instructions.  (R. 434).  Dr. Combrinck-Graham opined that Plaintiff "mentally is able to work.  Physically may not be able to exhibit much tenacity or stamina."  *Id.*  A note from June 2 indicates that Plaintiff was "still gaining depressive symptoms," but it was also noted that there was a reduction in the frequency, duration, and intensity of those symptoms.  (R. 486).  It was also noted that Plaintiff was "engaging in physical activity through working landscaping - feels energetic and very aware of surroundings."  *Id.*

Plaintiff, complaining of back pain that radiated down his right leg, was examined by Dr.

14

William Frances on November 3, 2011.  (R. 621-24).  For his pain Plaintiff was prescribed a

Lidoderm patch, Tramadol, and Flexeril.  (R. 624).  Plaintiff was seen at Bridgeport Hospital on

November 10, again complaining of back pain.  (R. 614-20).  He was prescribed Vicodin and

Motrin.  (R. 617).  From November 16, 2011, through November 22, 2011, Plaintiff was an

inpatient at the Bridgeport Hospital emergency department following a suicide attempt.  (R. 590).

Plaintiff stated that "I heard voices telling me to kill myself" at which point he overdosed on the

Tramadol, Vicodin and Flexeril that he had been prescribed.  Plaintiff's GAF score was 25 when

admitted and 45 when he was discharged.  (R. 585-86).

Plaintiff returned to Bridgeport Community Health Center on February 5, 2012.  He was

noted as taking Seroquel, Cymbalta, and Ambien.  (R. 650).  Plaintiff indicated that "he looks for

work but nobody will hire him."  (R. 649).  The treatment notes indicate that Plaintiff "came

across as manipulative.  I advised him to find a job." *Id.*

<u>Medical Opinions</u>

Dr. K.N. Sena of Neurological Specialists, PC, evaluated Plaintiff for workers'

compensation on March 5, 2009.  Dr. Sena indicated that the "only abnormalities noted were the

tenderness to deep pressure in the left groin area."  (R. 560).  Dr. Sena stated "[t]he assessment is

that the clinical features are most consistent with ilio-inguinal neuropathy on the left side.  This

is most probably a traction type of injury that occurred when he attempted to prop up a rather

heavy object."  (R. 561).  Dr. Sena recommended "early treatment with either Lyrica or

Neurontin and a tricyclic such as Nortriptyline for pain relief . . . In this examiner's opinion, Mr.

Jose Velez is disabled totally at this time.  With early intervention and appropriate adequate

treatment, the pain should be controlled for him to go back to work." *Id.*

15

On August 24, 2010, Dr. Adrian Klufas examined Plaintiff on behalf of the state

Disability Determination Services ("DDS").  (R. 344-46).  Plaintiff related "that his condition

became too severe for him to continue any employment beyond 1998.  On later questioning, he

states he thinks it was in 2006 that the injury happened."  (R. 345).  The physical examination

revealed that "he flexes forward at 40 degrees . . . He extends the right knee to about 90 degrees

and the left knee only to 85 degrees.  There is a lot of pain on extension of the left knee."  *Id.*

Although Plaintiff was able to mount the examining table by himself, it was noted that "he

appears to be in significant discomfort mounting and dismounting the examining table."  *Id.*  As

to his ability to walk, Dr. Klufas stated "[t]he patient's gait was somewhat antalgic with weight

bearing toward the right and he did have a broad-based gait.  He could ambulate without an

assistive device though."  *Id.*  Dr. Klufas added that Plaintiff "presents with apparent significant

psychiatric issues including diagnosis of bipolar disorder."  (R. 345).

Plaintiff underwent a psychological consultative examination on October 12, 2010, with

Michael Grant, Ph.D.[9] (R. 405-09).  The examination revealed:

> Mr. Velez obtained a **Verbal IQ of 74**, a **Performance IQ of 68**, resulting in a **Full-Scale IQ of 69**.  According to the Wechsler Adult Intelligence Scale classification system, his current level of intellectual functioning would best be placed at the very low level of abilities. It is the examiner's determination that this score represents a reliable estimate of this client's current intellectual skills.  It is unlikely that there was substantial regression from earlier IQ levels, and his performance is consistent with his reported academic performance.

(R. 407).

Dr. Grant indicated that Plaintiff "was unable to spell 'world' backwards, could read and

respond to a sentence, could write a sentence, but could not follow a three-stage command . . . He

---

[9]  This evaluation was performed at the request of the DDS.  (R. 405).

obtained a score of 27 on the Mini-mental State, indicative of no functional impairment." (R. 408). As to his ability to work, Dr. Grant noted that "[t]here was indication of moderate difficulty following and remembering detailed instructions involving two or more steps and delayed in time by more than several minutes. . . . He had difficulty maintaining attention and concentration for extended periods." *Id.* Dr. Grant also noted that Plaintiff had "difficulty with his ability to understand and respond appropriately to directions for similarities, picture arrangement, serial threes tasks and his ability to perform a sequenced task involving two steps without supervision." *Id.* Plaintiff was diagnosed with "depression - Moderate to severe – [not otherwise specified]," and a GAF score of 60.[10] *Id.* Dr. Grant, however, opined that Plaintiff was "mentally capable of managing disability payments." (R. 409).

On October 14, 2010, Dr. Adrian Brown performed a mental RFC assessment based upon his review of the records. Dr. Brown noted that Plaintiff was markedly limited in his ability to understand and remember detailed instructions. He opined that Plaintiff could handle one-or two-step directions, but due to Plaintiff's mood and low IQ, he would have difficulty remembering instructions that were more complex. (R. 78). Dr. Brown noted difficulties with carrying out detailed instructions, with maintaining attention and concentration for extended periods, and with his ability to complete a normal workday and workweek without interruptions from his symptoms. *Id.* He opined that Plaintiff could handle simple and repetitive tasks for two-hour periods, but that Plaintiff would have difficulty handling more complex tasks. Dr.

---

[10] A GAF score of 60 is indicative of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Http://www.gafscore.com/ (emphasis omitted).

Brown also indicated that Plaintiff was moderately limited in interacting with the general public and setting goals.  (R. 79).  Based on his review of the medical records, he determined that Plaintiff's mental impairment did not meet the requirements of Listing 12.04 for Affective Disorders. (R. 81).

On reconsideration, Dr. Robert Sutton reviewed the medical evidence on February 14, 2011 and agreed with the assessment of Dr. Brown.  (R. 94-5).  He noted that Plaintiff was not in psychiatric treatment which reduced his credibility.

<u>Standard of Review</u>

To be considered disabled under the Social Security Act, Plaintiff must demonstrate that he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Such impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §  423(d)(2)(A).

This Court's review of the Commissioner's decision is limited.  The decision "may be set aside only due to legal error or if it is not supported by substantial evidence."  *Crossman v. Astrue*, 783 F. Supp. 2d 300, 302-03 (D. Conn. 2010) (citing 42 U.S.C. § 405(g)).  "Substantial evidence" is less than a preponderance of the evidence, but "more than a mere scintilla."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is that amount of evidence that a

"reasonable mind might accept as adequate to support a conclusion."  *Id.*  "Thus, as a general

matter, the reviewing court is limited to a fairly deferential standard."  *Crossman*, 783 F. Supp.

2d at 303 (quoting *Gonzalez v. Comm'r*, 360 F. App'x 240, 242 (2d Cir. 2010) (summary order)).

<u>Discussion</u>

<u>(1) Whether the ALJ erred in finding Plaintiff's subjective complaints of pain not credible?</u>

　　　　Plaintiff argues that the ALJ erred in assessing his credibility, particularly in regard to his

complaints of pain.  The courts of the Second Circuit follow a two-step process for credibility

determinations. The ALJ must first determine whether the record demonstrates that the plaintiff

possesses a medically determinable impairment that could reasonably produce the alleged

symptoms.  20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not

alone establish that you are disabled; there must be medical signs and laboratory findings which

show that you have a medical impairment(s) which could reasonably be expected to produce the

pain or other symptoms alleged and which, when considered with all of the other evidence

(including statements about the intensity and persistence of your pain or other symptoms which

may reasonably be accepted as consistent with the medical signs and laboratory findings), would

lead to a conclusion that you are disabled.").

　　　　Second, the ALJ must assess the credibility of the plaintiff's subjective complaints

regarding the intensity of the symptoms. The ALJ is first required to determine if objective

evidence alone supports the plaintiff's complaints; then, if the evidence does not fully support the

degree of impairment alleged, the ALJ must consider other factors laid out at 20 C.F.R.

§404.1529(c)(3).  *See, e.g., Skillman v. Astrue*, No. 08-CV-6481, 2010 WL 2541279, at *6

(W.D.N.Y. June 18, 2010).   These factors include activities of daily living, medications, and the plaintiff's response thereto, treatment other than medication and its efficacy, and other relevant factors concerning limitations.  20 C.F.R. § 404.1529(c)(3).  The ALJ must consider all the evidence in the case record.  SSR 96-7p, 1996 WL 374186, at *5.  Furthermore, the credibility finding "must contain specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *4.

        In working through the two-step process, the Second Circuit has indicated that it is the Commissioner, not the reviewing court, who evaluates the credibility of all witnesses, including the plaintiff. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Importantly, "[c]redibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir. Office of Workers' Comp. Programs,* 119 F.3d 1035, 1042 (2d Cir. 1997) (internal citation omitted). Here, Plaintiff alleges that the ALJ failed to provide support for his conclusion that Plaintiff's subjective complaints were not fully credible. Defendant argues that the ALJ properly assessed Plaintiff's credibility by citing to, and relying on, expert medical opinions and Plaintiff's own testimony as the bases for his conclusion.

        Substantial evidence in the record supports the ALJ's findings on credibility.  First, the ALJ concluded that the first step for the SSR 96-7p analysis was satisfied, because "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. 35).  At the second step of the SSR 96-7p analysis, the ALJ concluded that

Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.*

The ALJ reviewed Plaintiff's testimony and contrasted it with his activities of daily living. (R. 35-6).  He noted that Plaintiff was able to live independently, travel to church alone, manage his personal care, and assist his ill mother.  (R. 36).  The ALJ concluded that Plaintiff's "ability to perform these daily activities demonstrates the ability to sit, stand, walk, lift, concentrate and attend, and otherwise perform work activity within the residual functional capacity." *Id.*  He also compared Plaintiff's testimony about his severe pain to the medical records, indicating that the medical records did not support the level of disability that Plaintiff alleged.  Although MRI results showed some disc degeneration, Dr. Katz's examination of Plaintiff revealed "no tenderness or muscle spasm in the low back region.  The range of motion is functional with discomfort on maximum flexion."  (R. 507).  There is further evidence that Plaintiff did not have significantly limited range of motion, muscle spasms or atrophy, motor weakness, sensory loss, or other objective factors that would indicate intense and disabling pain.  (R. 35, 506-07, 345, 350-51, 559-60).

Dr. Anand, noting that Plaintiff's MRIs revealed back issues, did not find Plaintiff to be as disabled as Plaintiff alleged.  Instead, Dr. Anand noted that Plaintiff's gait was normal and his motor function was "5/5 throughout, symmetric."  (R. 525).  Dr. Anand opined that Plaintiff "is capable of performing routine ADL's with moderate difficulty."  (R. 524).  This directly contradicts Plaintiff's subjective complaints of pain.

21

Plaintiff argues that the two orchidopexy surgeries he underwent provide support for his complaints of pain.  However, the medical record reveals that following the first surgery Plaintiff's pain was reduced and he was able to function more normally.  (R. 402).   In March of 2010 Plaintiff's treating physician, Dr. Armm, opined that Plaintiff was asymptomatic and recommended that Plaintiff return to work. (R. 402).  It appears that only after attempting to return to work did Plaintiff's symptoms return.  (R. 317).  Further, Plaintiff's date last insured is March 31, 2010, and Dr. Armm's opinion on March 22, 2010, weighs against Plaintiff being disabled for the entire time that he alleges.

Plaintiff's pain also appears to have been controlled when he was taking pain medication.  After receiving pain medication in the emergency department in August of 2010, Plaintiff reported having no pain or discomfort, and was noted as having "ambulated to [emergency department] lobby with steady gait, [no active disease]."  (R. 352).  In March 2009 Dr. Sena predicted that medication would relieve Plaintiff's symptoms.  Although Dr. Sena found that Plaintiff was totally disabled at that time, he also opined that "[w]ith early intervention and appropriate adequate treatment, the pain should be controlled for him to go back to work."  (R. 561).  Plaintiff also received transforaminal epidural steroid injections that reduced his pain.  "[H]is leg, foot and groin pain is improved with an initial procedures.  He states that his knee pain is better as well." (R. 518).  The ALJ also noted that the record contained periods of time when Plaintiff only needed over the counter medications to control his pain.

As to Plaintiff's complaints of knee pain, along with the reports of normal ambulation and range of motion above, an x-ray of Plaintiff's right knee performed on December 16, 2010,

revealed nothing abnormal.  (R. 626).  This objective medical evidence weighs against Plaintiff's credibility.

On balance, it was not "patently unreasonable" for the ALJ to determine that Plaintiff's subjective complaints of pain were not entirely credible given the totality of the medical evidence.  *Pietrunti*, 119 F. 3d at 1042.  The ALJ considered Plaintiff's subjective complaints of pain as the regulations require, and supplied reasons and evidence for discounting these complaints.  Given the "great deference" that a reviewing court must give to an ALJ's decision about credibility, the Court finds that the ALJ's credibility assessment is supported by substantial evidence.

(2) Whether substantial evidence supports the ALJ's assessment of Plaintiff's mental RFC?

Plaintiff argues that the ALJ erred in evaluating his mental RFC.  Plaintiff focuses his argument on the ALJ's evaluation of the opinion of Dr. Grant.  Plaintiff essentially argues that the ALJ erred by finding that Plaintiff could handle one- to three-step instructions.  Substantial evidence does not support the ALJ's finding that Plaintiff can handle three-step instructions.

 While the ALJ acknowledged that Plaintiff "would have had problems consistently remembering and performing detailed tasks or instructions," he still  found that Plaintiff could perform three-step tasks because Plaintiff "performed a relatively wide range of chores and leisure activities, and possessed sufficient cognitive and attentional abilities to perform simple, 1-3 step entry-level work tasks, which were within the limits of his physical capabilities."  (R. 36).  This conclusion flies in the face of the evaluations the medical doctors of record have made.

Dr. Grant, who evaluated Plaintiff's mental abilities, indicated that Plaintiff's "concentration is not good enough to allow him to read a short article or to watch a television

23

program without disruption." (R. 406). He also noted that Plaintiff "could not follow a three-stage command." (R. 408). Doctors Brown and Sutton assessed Plaintiff's mental RFC, and both opined that Plaintiff could only follow one- to two-step directives. (R. 78, 94). While Dr. Combrinck-Graham opined that Plaintiff could carry out single-step instructions, he also opined that Plaintiff would have a slight problem with carrying out multi-step instructions. (R. 434).

The medical doctors who assessed Plaintiff's mental functioning limited his ability to handle multiple-step instructions. Based on the clear opinions of these medical professionals, a "reasonable mind" could not find that substantial evidence to support the ALJ's conclusion that Plaintiff could perform three-step instructions.[11]

(3) Whether the ALJ properly performed a combination of impairments analysis?

It is well-settled that the ALJ must consider all of a claimant's impairments individually and in combination throughout the disability process, even if an impairment, when considered separately, would not be of sufficient severity to serve as the basis for eligibility for disability benefits under the law. *See* 20 C.F.R. § 404.1523 (requiring the ALJ to consider the combined effect of all of a claimant's impairments throughout the disability evaluation process); SSR 85–28, 1985 WL 56856, at *3; *see Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir.1995).

Plaintiff alleges that the ALJ failed to consider his mental and physical impairments together, and in particular, the effect of his obesity on his other impairments. Here, the ALJ explicitly acknowledged his duty to consider each of Plaintiff's impairments. (R. 29, 32). He wrote that "[t]he undersigned has fully considered the claimant's obesity in combination with his

---

[11]   The Court notes that the Commissioner appears to agree with the contention that Plaintiff cannot perform three-step instructions. *See* Def's Mem. at 11-12.

other severe impairments, and finds no listing was met or equaled in consideration of obesity."
(R. 29).

When evaluating Plaintiff's RFC, the ALJ wrote "[i]n making this finding, the
undersigned has considered all symptoms. . . ."  (R. 32).  Ultimately, the ALJ found an RFC that
included both exertional and nonexertional limitations and was based upon the combination of
all of Plaintiff's impairments.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00Q;[12] *Lena v. Astrue*,
No. 3:10cv893, 2012 WL 171305, at *12 (D. Conn. Jan. 20, 2012) (finding no error in the ALJ's
alleged failure to consider the plaintiff's impairments in combination where the ALJ repeatedly
described the requirement that he do so, he found that her impairments in combination did not
meet a Listing, and he considered all of her impairments in determining her RFC). Plaintiff has
also not identified how his obesity impacted his ability to perform sedentary work.  Plaintiff does
not provide any evidence of specific effects of his obesity on his ability to work, nor does he cite
to any medical evidence of record concerning the functional limitations caused by his obesity.
Therefore, the Court finds no error in this regard.  *See Francis v. Astrue*, No. 3:09cv1826, 2010
WL 3432839, at *4 (D. Conn. Aug. 30, 2010) (rejecting the plaintiff's argument that the ALJ
failed to consider his obesity where the plaintiff did not identify any documents suggesting that
obesity worsened his other impairments or worsened his ability to work), *report and
recommendation adopted by* 2011 WL 344087 (D. Conn. Feb. 1, 2011).

---

[12]   Section 1.00Q provides in relevant part:

[W]hen determining whether an individual with obesity has a listing-level
impairment or combination of impairments, and when assessing a claim at other
steps of the sequential evaluation process, including when assessing an
individual's residual functional capacity, adjudicators must consider any
additional and cumulative effects of obesity.

(4) Whether substantial evidence supports the ALJ's finding at step five?

The ALJ determined that Plaintiff had the RFC to perform a full range of work at the sedentary level compromised by a non-exertional limitation of "simple 1-3 step entry-level work tasks." (R. 32). However, he found that this non-exertional limitation had a minimal effect on the occupational base of unskilled sedentary work and, therefore, a finding of "not disabled" was appropriate under the framework of section 201.23 of the Medical Vocational Guidelines ("grids").[13] 20 C.F.R. Pt. 404, Subpt. P, App. 2.

Plaintiff argues that the ALJ erred by failing to call a vocational expert ("VE") and by relying instead on the grids to meet the Commissioner's burden at step five to establish that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform given his non-exertional limitations.

Ordinarily, at the fifth step of the sequential evaluation process, the Commissioner can meet his burden by referring to the grids, which dictate a finding of "disabled" or "not disabled" based on a claimant's exertional restrictions, age, education, and prior work experience. *Allison v. Apfel*, 229 F.3d 1150, 2000 WL 1276950, at *3 (6th Cir. 2000)(Table); *see also Heckler v. Campbell*, 461 U.S. 458, 462 (1983). Here, the ALJ relied on Rule 201.23 of the grids as a framework in finding that Plaintiff was not disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §

---

[13] The grid is a matrix of the four factors identified by Congress - physical ability, age, education, and work experience - and sets forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled. *Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983).

201.23. The introduction to the grids, however, provides that "[s]ince the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental ... impairments." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e).

The law in the Second Circuit as to when the ALJ may rely on the grids without the need for testimony of a vocational expert is clear:

> [S]ole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded *by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform*. In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

*Butts v. Barnhart*, 388 F.3d 377, 383–84 (2d Cir. 2004) (quoting *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999))(emphasis added); *see also Zedanovich v. Astrue*, 361 F. App'x 245, 246 (2d Cir. 2010); *Bapp v. Bowen*, 802 F.2d 601, 605–06 (2d Cir. 1986).  In *Bapp*, the Court emphasized that whether vocational expert testimony is required must be determined on a case-by-case basis. "[I]f a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments." *Id.* (internal quotation marks and citations omitted).  Thus, where a claimant's "work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate." *Id.* at 605.  The Court then explained what it meant by the phrase "significantly diminished"—that is, "the additional loss of work capacity beyond a negligible one

27

or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 605–06.  If the range of work is significantly diminished by the nonexertional impairments, vocational expert testimony is necessary. *Id.* at 606.

In this case, Plaintiff has both exertional and non-exertional limitations.  Plaintiff has been diagnosed with bipolar disorder NOS,[14] low IQ,[15] major depressive disorder, and mood disorder.[16]  The ALJ found Plaintiff's bipolar disorder and obesity to be severe impairments. Doctor's Brown, Sutton, and Grant all opined that Plaintiff could only handle one- to two-step instructions.  (R. 78, 94, 408).  Dr. Brown and Dr. Sutton also opined that Plaintiff was moderately limited in his abilities to concentrate and complete a work week without interruptions from his psychological symptoms.  (R. 78, 94).[17]  Plaintiff's GAF scores were generally around or

---

[14]  *See Stober v. Astrue*, 3:09CV1014, 2010 WL 7864971, at *13 (D. Conn. July 2, 2010) (Identifying bipolar disorder as a nonexertional impairment, and precluding reliance on the grids when Plaintiff had nonexertional impairments that were significant).

[15]  *See De Leon v. Sec'y of Health & Human Servs.,* 734 F.2d 930, 936 (2d Cir. 1984) ("Surely a borderline IQ has a bearing on employability, even as a mop pusher, porter, or maintenance man.").

[16]  *See Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) ("An ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." However, in this case the plaintiff's ability to perform the full range of sedentary work has been significantly compromised by his nonexertional mental limitations, as well as by his obesity and a vocational expert should have been called).

[17]  *See Smell v. Astrue*, 2012 WL 5864497, at *9 (M.D. Pa. Nov. 19, 2012) (ALJ limited the claimant to unskilled work involving simple 1-2 steps, but that limitation did not adequately reflect a moderate to severe limitation in concentration, persistence, or pace. There were clearly many unskilled jobs that required an employee to maintain concentration, persistence, and pace. There was no evidence in the record from a VE that a moderate to severe limitation in

just below 50, which represents serious symptoms of social or occupational functioning.  (R. 479, 482, 488, 490, 494, 585-86).  Plaintiff has also attempted suicide.  (R. 590).  He has been found to have a Verbal IQ of 74, a Performance IQ of 68, and a Full-Scale IQ of 69, which indicated to Dr. Grant that Plaintiff was "at the very low level of abilities."  (R. 407).  Plaintiff also testified that he dropped out of school after completing the ninth grade.  (R. 51).  Finally, even though the ALJ did not find Plaintiff's complaints of pain wholly credible, it is clear that Plaintiff suffered from at least some pain during the time in question.  These are all nonexertional impairments that could have significantly impacted Plaintiff's occupational base.

Although the ALJ found that Plaintiff had a nonexertional limitation that limited him to one- to three-step instructions, he concluded without any elaboration that this limitation would have "minimal" effect on the base of unskilled work at the sedentary level.  The Court finds that the ALJ did not adequately explain the extent to which Plaintiff's nonexertional impairments would diminish his capacity to perform unskilled work.

Additionally, the Court has concluded that the ALJ erred in finding that Plaintiff could handle three-step instructions.[18]  The medical evidence of record indicates that Plaintiff can only handle one- or two-step instructions.  This would place Plaintiff at a Dictionary of Occupational Titles ("DOT") reasoning level of 1.  U.S. Dep't of Labor, *DOT*, 1009-12 (4th ed. 1991).  The ALJ only specifically identified two positions that Plaintiff could perform.  (R. 38).  The job of

---

concentration, persistence, or pace would not impact the claimant's ability to maintain employment as a bench assembler, packager, or inspector.)

[18] *See supra* at 23.

surveillance worker, however, requires a reasoning level of 3.[19]  If, as the evidence suggests, Plaintiff can only function at a reasoning level of 1, then he would not be able to work as a surveillance monitor.  Plaintiff then, would be unable to perform one of the only two jobs that the ALJ identified.[20]  Without further evidence, it is not clear from the record that the Commissioner has met his burden at step 5 of showing that there exists a significant number of jobs in the national economy that Plaintiff could perform.

Therefore, this case should be remanded for the ALJ to re-evaluate whether the Commissioner has carried his burden of demonstrating that Plaintiff's ability to perform unskilled work at the sedentary level is not significantly diminished by his nonexertional impairments.  On remand the ALJ should specifically identify the Plaintiff's nonexertional impairments. If the ALJ finds that Plaintiff's ability is significantly diminished, then the ALJ should secure the testimony of a vocational expert regarding the existence of jobs in the national economy that an individual with Plaintiff's nonexertional impairments would be able to perform.

## Conclusion

Accordingly, the Court recommends that Plaintiff's motion to reverse the decision of the Commissioner be granted [Doc. # 16] and that Defendant's motion to affirm be denied [Doc. # 20].  This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2).

---

[19]  Surveillance-System Monitor (government ser.) OCCUPATIONAL INFO (May 26, 2003) http://www.occupationalinfo.org/37/379367010.html.

[20]  The other job the ALJ identified, "table worker" only requires a reasoning level of 1, and, therefore, Plaintiff would have the requisite reasoning level to perform the functions of that position.

In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part. *See* Fed. R. Civ. P. 72(b)(3) and D. Conn. Local  Rule 72.1(C)(1) for Magistrate Judges.  The Clerk's Office is instructed that, if any party appeals the decision on remand to this court, the subsequent case is to be assigned to the Magistrate Judge who issued the Recommended Ruling in this case, and then to the District Judge who issued the Ruling that remanded the case.

SO ORDERED, this   16th     day of October, 2014, at Bridgeport, Connecticut.

     /s/ *William I.Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge

31